Here ye, here ye. This Honorable Ocala Court for the Second Judicial District is now back in session. The Honorable Susan F. Hutchinson presiding. Please be seated. Your Honor, the final case on the docket this morning is 2-22-0281. People of the State of Illinois Plaintiff Appellee v. Isaac T. Echols, Feminine Appellant. Arguing on behalf of the Appellant, Ms. Laura Peters. Arguing on behalf of the Appellee, Ms. Pamela S. Wells. And good morning to those here and good morning Ms. Wells. Good morning. Well she's... Good morning. All right. Then if you are ready, Ms. Peters, you may go forward. So good morning, Your Honors. My name is Laura Peters and I'm here today on behalf of the Defendant Appellate in this case, Mr. Isaac Echols. As Your Honors are aware, Mr. Echols is raising four issues in this appeal. However, because the State did concede Issue 3, the One Act, One Crime issue, there's only three remaining issues for Your Honors to decide in this case. And as far as those three remaining issues go, I'd like to focus my time here today talking about the first issue and perhaps the second if there's time. The reason for that being because if Mr. Echols is able to prevail on either Issue 1 or 2, there's no need for Your Honors to even get to or address the fourth issue at all. However, having said that, I'm obviously happy to answer any and all questions that Your Honors have on any of these issues. So to jump into the first issue, it's Mr. Echols' position that the whole house search conducted by parole agents during a parole check on his brother, Terrell, was illegal. And as a result, the fruits of that search should have been suppressed. And I think it's important in this case to keep in mind... What's the scope of the written consent that he signed? The scope of the written consent that Terrell signed? Yes. So specifically, that MSR form said that he would consent to searches of his person, property, and residence under his control. So specifically under his control, I think, is a big part of what that scope actually entails. And I think it's important to keep in mind in this case... We're talking a lot about Terrell and focusing on Terrell because he's the parolee. He's the reason for the search. He's the reason for this parole check in the first place. But this really isn't a case about the parolee's Fourth Amendment rights. It's about the rights of the people in the home that weren't on parole and who didn't have any kind of diminished expectation of privacy under the Fourth Amendment, but yet who had their Fourth Amendment rights trampled by these parole agents in the course of this parole check. So with that in mind, I think it's helpful to just work through step-by-step this check and why it was illegal. So the first step would be, was there a warrant? And obviously, no. These parole agents did not have a warrant. There's no claim that they did. So this is a warrantless search of a private residence, which presumptively would be illegal. So the next step would be... Until a certain time. Didn't we get a warrant later? Correct. After the first illegal search. So it's not totally warrantless, but I get your indication. Just to focus on the parole search for now. Yes. So the next step would be, is there consent that could justify this search? And again, the answer there is no. They never asked for consent from anyone for this search. They never received consent. And to some extent, the state seems to be arguing that there's a host site agreement here, which would have given perspective consent, that the homeowner, Maria, gave her perspective consent for any kind of search of this home. But that's clearly not the case here. In fact, in the record at R-729, the state below even conceded that we don't have a host site agreement here. So there's no permission from the owner of the home for this search. But Terrell never – well, he said he slept on the couch or he slept in the living room, but there was also a room somewhere that he would use sometimes. And he was not a permanent resident. At least it doesn't appear that he was from the facts that we have in the record. So if there are other places he could have been or he was during the course of his visiting or living in this residence, I guess this is his grandmother's residence. Yes. Why couldn't they expand beyond the living room where they found one set of clothes, a pair of shoes, and something else? And he's been on parole for four months, four or five months? Correct. So unless he's only got one outfit, it's a little unusual. I mean, why can't they expand their search to places he could go? So I think that goes back to Justice Jorgenson's question as far as the limited scope of where these parole agents are allowed to search. And they're allowed to search areas that are under Terrell's control. As far as, you know, we're not claiming that they couldn't search the kitchen or the living room. Those are clearly common areas that he would have had control over. However, this bedroom, there was no indication that he ever stayed in this bedroom before they searched. So they asked him, where are you staying? And he indicated the living room couch, and occasionally he stayed in his sister's bedroom. They looked in those areas. They decided, well, I don't think you have enough stuff here. This seems kind of strange. Well, isn't the purpose, I mean, regardless of the words, what's control mean, what does it not mean? The whole point of the check, the parole check, is you said when you left the Department of Corrections, I am going to live at this address. And so one of the points of the police, excuse me, the parole agents going there in the first place, is to confirm that he lives there. And when he says, that's the totality of what I have. I sleep on the couch, there's my necklace, and there's a pair of shoes. Based on those responses, wasn't it reasonable for them to then say, you know what, the purpose here is to confirm whether you live here. We're going to find out if you live here. If you don't, you have violated your parole. So doesn't that, I'm sorry, I'll give you all the time you want to answer. Doesn't that then open the door, no pun intended, for them to look elsewhere to either confirm or deny that he lives there? I would say no. Because? The reason being because, again, this is limited to the scope of what he controls. If they decided, okay, the only place that they had any indication that he was staying was this couch in his sister's room. If the parole agents decided that they didn't believe that for whatever reason, they had a lot of options at their disposal that didn't involve kind of just ignoring the Fourth Amendment rights of the other people that they knew lived in the home and they knew were not on parole and did not have a diminished expectation of privacy under the Fourth Amendment. I think the trial court and the state has kind of fallen into this false binary here of on the one hand, either we have to have parole agents that just believe whatever the parolee says and they're bound by that and can't do anything else. Or we just give parole agents unfettered access to search. You know, we have no indication that he goes in this area, but it's physically possible so we can go search that area. There's a lot of other steps that they could take that don't have to be these two extremes. It's what they could take, but are they obligated to? I would say yes in a situation. Based on what? Because they are well aware that there are at least four other people living in this house, again, that are not on parole and do not have any kind of diminished expectation of privacy under the Fourth Amendment. To say that they can just ignore that and that this parolee, the fact that there's a parolee here that trumps anyone else's Fourth Amendment rights, I think is not supported by case law. The state has yet to cite a case that says you essentially sign away any Fourth Amendment rights you have if you agree to live with a parolee. That's just not the law. And they still had this privacy interest in their bedrooms, in private areas, and these parole agents went in and searched the whole house without any indication that Terrell ever went there. They should have done any level of investigation, right? If they don't believe Terrell, that's fine. Go ask any of the other four people that live there, you know, where does Terrell stay? What's up with that room over there? Who goes in there? They could ask those questions. Or if they felt like they had enough, they could have asked to get a search warrant from the police officers who were stationed right outside. Or they could have said, you know what, I think you're not being truthful with us, Terrell. We're going to revoke your parole because you're not being compliant. In fact, there is comment in the testimony about he was perspiring, he seemed nervous, he was handcuffed. He, especially when they came out of the pink bedroom, I think they noticed that more particularly, that he seemed nervous. And it's pretty obvious that they were now concerned that he lived there at all because it's just not reasonable to have one set of clothes. He has no actual interest in the property, so we can't say he's not the deeded owner of the property. But when they're walking from the one bedroom to the living room to, as you said, maybe they could look at the kitchen because he probably ate there, where is this south middle room by comparison to those or in perspective to those properties or pieces? That's a really good point, Your Honor. So to kind of clarify the layout of this house, we have the living room area. And I know the state's brief sort of makes it seem like standing in the living room area next to the couch that Terrell says he sleeps on, there's just a, you know, you can look, essentially just walk right into this bedroom. And that's not the case here. There's actually two doors and a hallway separating the living room from this bedroom. The bedroom is essentially kind of like its own wing of this house.  There was testimony from Sandra, Maria's caregiver, that that door was almost always closed and locked. But Samuelson, the parole agent, said it was open. So we have the first door. Then you go a little ways down a hallway. On the left-hand side, there's another door that leads up to the attic. And then you go further down that hallway, and then you get to the doorway of this bedroom. So it's not like this is in, you know, the middle, the central part of the house that they were, you know, walking. This is even a different hallway than, you know, the sister's bedroom. So it's not like she was walking to the kitchen or walking to the sister's bedroom to verify that that's where he was staying and happened to look in this room. This is very much its own separate and apart area of the house. Go ahead. If you give the trial court's findings deference, then it's true, isn't it, that if that door is open, the bedroom doors, I really couldn't tell how far, but in the video it didn't look far at all. It seemed like that area is small. And according to what I understand the parole officer's testimony to be, she crosses the threshold of the hallway door, turns and looks in what she says is the open bedroom door, and at that point, with a flashlight, sees the butt of a gun on a dresser. And then, you know, events roll from there, but it seems like that's the start of what they're going to use as probable cause for the search warrant. I would disagree with Your Honor that Samuelson's testimony was that she was, you know, just stepped into the hallway and she could immediately see it. Actually, her initial testimony – I think I said she walked through it and then turned to the bedroom door, but I'm sure you're right. There's some nuance there that I'm glossing over, but I did understand her to say that as she stood in the bedroom door and with the light, her flashlight, she could see the butt of a gun. Correct. So, again, I think her initial testimony is that she walked into the bedroom and then saw the butt of a gun, which, again, that's a bedroom that clearly someone has a privacy interest in, and they have no indication at this point that Terrell has ever accessed or controlled it, other than the fact that it exists and it's physically possible for him to have entered it. There's no – they didn't ask – Terrell never indicated that he went in that bedroom. They never asked anyone else if he went in that bedroom. They didn't – you know, he wasn't trying to – there's no indication he was sort of trying to pull their attention away from that bedroom. There's really nothing they can point to to say, okay, we have a reason to think that Terrell does control this bedroom. So she steps into that bedroom, which is, again, not lawful, because she has no idea whether Terrell has ever been there, and she knows there's other people in the house that do have a privacy interest in that bedroom. I would also say the other way that the State has kind of tried to justify this is through a security sweep in that area, and I think if you look at the facts of this case, there's no reason for there to have been a security sweep of this entire house. You know, any threat that Terrell himself as a parolee could have potentially posed was neutralized almost immediately when they walked in, patted him down, found nothing, and handcuffed him and sat him at the dining room table with a police officer – or a parole agent next to him. So Terrell doesn't represent a threat, so what security threat was there? The parole officers never, you know, name any kind of threat that, oh, we thought we saw movement, we were hearing weird noises, nothing like that happened. And so there's just no reason for this, you know, this security sweep to have happened. And in fact, Agent Samuels – Given that Wilson says, one, as you point out, that the mandatory supervised release agreement is not consent, there's no consent here, but the suspicionless search of the defendant's bedroom – the defendant in that case was the parolee – did not violate the Fourth Amendment under the totality of the circumstances. Does it really matter whether a security search was justified or not? I would say it does matter, because as we pointed out in the briefing, I think Wilson is distinguishable from this case. I think it's actually a really good foil to this case, because in Wilson, the parole agent knocked on the door, some family member of the parolee opened the door, and as that happened, the parole agent saw the defendant walking out of a bedroom. He then followed up with the defendant and asked, hey, is that your bedroom? And the defendant said, yes, it is. So when they did that search, they knew, they had, you know, certain knowledge that this is an area – if I could just finish my thought – that this was an area that that defendant controlled, that the parolee controlled. Here, we don't have anything like that. Terrell never indicated it was his bedroom. They never saw Terrell near that bedroom. They didn't bother to ask anyone else in the home whether Terrell went there. They have nothing connecting that bedroom to Terrell to justify the search. No, I don't have any questions. Justice Malone. No. All right, thank you. You'll have an opportunity to reply. All right, Ms. Wells, we'll make sure your mic is open, and you may proceed. Thank you, Your Honors. Justices, counsel, may it please the Court. I'll start with Issue 1 as well, since that is what counsel spent her time on. And the people disagree that factually – and the findings of facts, as I believe it is Justice Malone indicated, is entitled to deference. The finding of facts is only overturned if it is against the manifest weight of the evidence. And the trial court did find those findings of facts can be found in the record at C-416-18. And he did find that the parole agent was in an area she lawfully had a right to be. And I want to point out that she did testify at pages 524 to 525 of the record, 553, 558, and the supplemental record at 19 that she was outside the bedroom when she saw the gun. She did not equivocate on that, and that is important testimony, because the trial court found her credible in its findings of fact regarding the Franks hearing. And the only time she testified was this one occasion. Now, Ms. Wells, why was she in a place where she could be? Because we're outside of the pink bedroom, I think it's called, and we're outside of the living room at this point. She is in a hallway looking through an open door, and the testimony was that from next to the couch, she had a clear view through both open doors into the bedroom. And that citation can be found at 524 through 533 of the record. So she did not equivocate. I know that there has been much made about the first testimony, her first comment that she clarified and never wavered from, and that is important because, as I indicated, the trial court found her credible. So it is from outside the room where she had a right to be, because she was conducting a search or a determination whether this parolee even resided there. And this is not a situation where we're opening up every search to, you know, someone's purse, someone's locked apartment. This is a situation where it's an open door that she could see right through, and therefore there is nothing wrong with this search because the touchstone is, was it reasonable? And she was determining whether this parole agent or whether this parolee even resided there and if he was in compliance with his mandatory supervised release. Well, didn't his uncle say that he didn't live there regularly even before they got into the search? I think that was Isidoro Alvarez or something. Didn't he say that really he didn't live there all the time anyway? No, what the uncle said, and I don't remember if it was at the kitchen table. I think it was at the police station actually, was that the parolee stayed in that bedroom up until about two weeks ago. I did not recall the record being that the uncle said the parolee did not reside regularly at that address. If I'm incorrect, I apologize, but that is not my recollection. All right, so when they go into the pink bedroom and he doesn't have property there, when he doesn't have property near their couch, when Samuel questions him a second time and he denies having a cell phone, having mail, even though he's been out on parole for four months, he doesn't have any property in the house that he's supposed to be living in, and he's sweating and he's nervous and he's vague in his answers, they have a responsibility and the Wilson case cites Sampson and it talks about the heightened government interest in supervising parolees. And so when you have a lessened expectation of privacy by the parolee and you have the heightened responsibility of these parole agents to determine if he even lives there, plus you have a signed, as Wilson said, a signed MSR agreement, which while it is not a prospective consent, it does go to the reasonableness of his expectation of privacy or whether he thinks there's going to be a cert. You have a grandmother who had signed, or not had signed, but had done a verbal host agreement because he wouldn't have been released without a host agreement,  So you have all of that going into whether the search was reasonable. And that is the only question here. And Samuelson, and I understand the defendant wants to talk about this being a search of the whole house, but the question here is, Samuelson never enters the room and sees the butt of the gun through an open doorway. So we have plain view dovetailing with a situation where she is in a place that she has a right to be right next to the couch where Alvarez says he sleeps. So you have plain view dovetailing with the lessened expectation of privacy. That goes to whether the search is reasonable. And that was the question.  We relied on Wilson. And I don't think that Wilson is really distinguishable because the agent is standing right next to the couch looking through doorways when she sees these guns. She testified she saw the guns before she entered that bedroom. And then they do exactly what everybody would expect them to do. They get a search warrant. So I think based on the good faith exception, which we argued in Section B, as well as the reasonableness of the parole agent's actions and the fact that the guns were in plain view from a place she had a legal right to be in conducting her compliance check, this was a reasonable search. Is it fair to say that your argument is that if it was reasonable as to Mr. Alvarez, then because your contention is they shared this space and both had common control over the space, therefore under, I think you cite common authority cases, which are a little different, but it seems like you're asking that those be extended to support the proposition that the search is reasonable as to Mr. Echols. Is that fair? I do cite those cases to argue that that is why it is good faith of the parole agent to rely on, and the police officers to rely on the information they had gathered when he's so close in proximity to where those guns are located and the doors are open. So, yes, I do cite those cases for that proposition, Your Honor, Justice Mullen. But the reason, the fact is once they see the guns and they get the search warrant, there is no further issue related to somebody else's privacy rights. The question is whether the search is reasonable. It's not is it reasonable as to the defendant or reasonable as to Mr. Alvarez, and to be very clear, the defendant doesn't have the ability or the standing to raise the rights of the caretaker, the uncle, the sister, the grandmother. So we're only talking about his standing as to himself. But in this situation, it doesn't matter whose rights we're talking about. If the search was reasonable, the search was reasonable, and it doesn't violate anybody's Fourth Amendment rights. And that is our position here is that the search was reasonable. I can address Argument 2 or Argument 4. I do want to point out as to Argument 3, because they didn't raise a constitutionality challenge as to Argument 3 or as to those counts, if for some reason, and we were very thorough in our brief, and we think that there is a reason that this statute, felons in possession statutes, are legal or constitutional in relationship to the defendant. We've outlined that clearly. But if the court for some reason were to find it unconstitutional, the other counts would remain because the One Crime, One Act would only make those counts fall if the felon in possession counts are unconstitutional. But briefly, as to the fourth argument, there really are three reasons why the statute is constitutional. The first is that Illinois precedent after Heller found that UUW felon is constitutional, and that remains by any precedent because Bruin only abrogated the scrutiny prong of what courts were doing post-Heller, and those cases that I cite in my brief do not rely on that scrutiny prong. Second, the plain text does not apply to defendant's conduct, as the people in the amendment itself applies to law-abiding citizens. The defendant is not a law-abiding citizen as a felon. Doesn't the Second Amendment use the word people without descriptor or without limitation? It does use the word people without limitation or descriptor, but many courts have found that the people does not apply. I mean, other courts have looked at that, but the language is the language, and we now have Bruin that says you look at the exact text of the Second District. But the plain text, as it's been applied, the people, voting rights can be restricted, other rights can be restricted. I appreciate that, but that goes to the second half of Bruin, which is, is there a historical basis for excluding certain other people from the Second Amendment? This applies to people. In other words, is it the first step or is it the second step that really controls here? Isn't it the exceptions to the Second Amendment being the second step? Courts have looked at it in two ways, and a large number of courts have found that non-law-abiding citizens are not included in the people, and I have cited those cases in my brief. There is a second step, which is even if that plain text, which is what Justice, you were indicating, even if the plain text does apply, the historical analysis that we have put in our brief shows the longstanding historical tradition of felon dispossession statutes. And finally, even if, even if those arguments are concerning to the court and you think that there needs to be further consideration of an as-applied challenge, the problem is defendants did not raise this at the trial level. And the Bruin court specifically talks about needing the parties to have the historical analysis and the facts raised, and the people were not able to do that in the trial court because it wasn't raised until the first time on appeal. And so we think that they have forfeited that argument by failing to raise it before the trial court when a complete record could be developed. Because of that, that is the outline of the analysis we think needs to be done as to Bruin and why we think that it is constitutional. And I understand that we now have Bruin, but as I indicated in my brief, Bruin only did away with the second step regarding scrutiny, and Heller relied on the same textual analysis and they were very clear that the felon dispossession statutes were presumptively constitutional, and that is the language that was used in Bruin. I'm sorry, in Heller. So I won't spend a lot of time because the briefs were so thorough on Bruin on that issue. So if there are any other questions, I would be happy to answer them. Otherwise, I think I've addressed the main issues before the court. Thank you. Would you care to address the issue of the propriety of barring evidence to be presumably the defense wanted to present as to Terrell's involvement, his past history with gun possession, et cetera? I'm going to start with the evidence that the parole compliance check was requested because of the suspicion that Alvarez was in a police shooting. The court absolutely reserved until that following Monday, and that can be found at 1874 of the record, that he didn't want to keep the jury waiting. So the court said, I'm going to address Sergeant Tate. He's not here. We'll address that Monday. And therefore, I see my time is up, but I'll finish my thought on this. You may. Therefore, when defendant did not raise the issue on Monday, did not attempt to call Sergeant Tate, did not ask the court for a ruling, they have forfeited that issue. And unless the court wants me to address the other two sections, since my time is up, I will defer to my brief on that. But I do have one question about this, excuse me, other evidence. Counsel said that for the defendant that her whole case was that these were not his. They were Terrell's. But the argument keeps coming back from the state, well, you know, they co-possessed them. I mean, that was not her purpose. She wanted to show that they were Terrell's. Isn't that true? Yes. However, they didn't try to get in the statement through non-hearsay means. And even on appeal, they have not identified a non-hearsay exception that would allow Mr. Alvarez's statement to come in. And the firearms history is so unconvincing, being convicted and on parole for heroin doesn't have anything to do with firearms. The fact that a case was dismissed, we don't know that he would have ever been found guilty of that. He was charged with threatening to shoot a police officer, but no one knows, the proffer doesn't indicate that he actually possessed a firearm. He was convicted of discharging of disorderly conduct where he apparently had a gun, but that is not relevant to whether he possessed the seven guns that are in the bedroom. And it was, and being arrested for a replica firearm, that's not even a gun. And that was from 2010, which was very old. So given that they didn't raise, that they raised it as trying to show a habit, and these are very sporadic situations which don't go to habit number one, and that was what the trial court was asked to rely on. So the trial court found it was improper character evidence, that it wasn't relevant, and because they are so separate type offenses where they don't actually have a bearing on who possessed the guns in 2018 that were in that bedroom, that is why it was irrelevant and should not have been admitted. So the court did not err in that. Is it reasonable to presume that even if they were Terrell's guns, they could also have been jointly possessed by the defendant? Absolutely, and I cited the cases that said that possession by one does not exculpate or exonerate the other, and that is the law. Givens and Ingram stand for that proposition. So the trial court, given the nature of the evidence and that information, and the fact is the defendant called Mr. Alvarez as a witness and chose not to ask him if they were his guns, chose not to ask him if that was his bedroom. So those are things that they could have done, and I still believe that a harmless error analysis would carry the day on the court's questions because defendant confessed in a statement to his buddy that was in the Department of Corrections before he was even charged that those were his guns in his bedroom and his fingerprints would be all over them. Just this moment, do you have any questions on anything else? No, thank you. You may summarize if you wish, and we'll move on. Your Honors, justices, our brief stands for everything that I've already outlined, and the court's questions, we believe that the conviction should be affirmed, the parent's offenses are constitutional, and we would ask that you affirm the trial court's decision. Thank you. All right, Ms. Peters, do you have any response? Thank you, Your Honors. I apologize for kind of jumping around here, but there's a couple different things I'd like to address. To go back to just the first issue, the state is maintaining that there was a host-site agreement here and that that was a verbal host-site agreement that Maria entered into, and, I mean, that's just not the case. We have uncontested testimony here in the record that Maria was disabled and nonverbal at this time. So, I mean, the state has yet to explain how it would be physically possible for her to have entered into this agreement verbally when she's nonverbal, and they've not offered any kind of, you know, testimony to rebut that. So, again, the state below admitted and conceded that there was no host-site agreement here. So there's no presumption that these parole agents could have gone, you know, anywhere they wanted in this house because there was a host-site agreement. I see your point on that, but is there, if you look at the totality of the circumstances and the reasonableness of the search, if you have a parolee staying with you, don't you understand that you're going to have law enforcement in your life, at least on some level? I would say that we don't even know that Maria was aware that Terrell was on parole from the record. But everyone was saying everybody in the house. Well, we don't know that anyone else in the house, you know, what their knowledge was as far as whether Terrell was on parole or what that actually meant for them. And, again, as far as the reasonableness, I would just also point out that the cases that the state cites as far as, you know, suspicionless, consentless searches being okay, the only case they cite that involves going into a home that is occupied by a parolee and non-parolees is People v. Wilson, which, again, we would maintain is very different from this case because that parole agent knew, had certain knowledge before he searched the bedroom, that that was controlled by the defendant. And, again, after he searched that bedroom, he didn't just start wandering around the rest of the house to see, well, maybe the parolee is there. Would you concede that a hallway is a common area? In this case, I would not say it's clearly a common area. This is not a hallway that, you know, led to, oh, here's the kitchen is here or lots of common areas. Like I said before, I think effectively this bedroom was kind of its own wing of the house. There was nothing else down there except this bedroom. Wasn't there a stairway to another place? Correct. There was also a door to the attic. But if that was at issue and they were, you know, reasonably searching the whole house, I would ask, well, why didn't the parole agents open that door and go search the attic? Well, I guess the question I have, and I was going to ask it before, why are we calling this the south middle bedroom if it's not a middle bedroom? You're calling it that. The State's calling it that in the briefs. Little implies that there's something on either side that could be accessed. So I would say I referred to it that way just because that's the way that it was referred to down in the trial court. As far as where it's located, again, I don't think that it's contested that down this hallway there is only this attic door and this bedroom. Perhaps there's another hallway on the opposite side that goes somewhere else, but as far as this hallway, there's nothing else down there. It's not connected to other areas of the house. It's just, you know, this hallway with the bedroom. And I would also note that just as far as the State makes a lot of this nervousness that Terrell was showing, I would point out that he had had multiple compliance checks in the past and they were all a single parole officer showing up and just more of a casual conversation. This was three agents banging on his door at 7 a.m. He was immediately patted down and handcuffed. So I think, you know, showing a certain level of nervousness I think would be only natural for this situation. So to say, you know, the point to he's nervous, therefore we get to search this entire house, I think is just a disingenuous position. I can see your point of view on that, but when pressed, like where is your stuff? I mean, it seemed like the parole officer was saying, where are your things? And I think his answer was along the lines of, well, I don't have any. Right. So again, I would say this case is, though, about the other people in the house who are not on parole and their rights. And so if the parole agents did not believe Terrell, the correct, the legal response is not we're just going to go, we're going to ignore the existence of these other people and their Fourth Amendment rights and search the whole house. It's to maybe do a little bit more investigation, maybe ask for a search warrant, you know, take steps to verify, are we searching a place that we can, you know, we have a reason to believe Terrell controls here, not, you know, we'll go search first and then if we find something, we'll use that to justify it after the fact. Well, not to put too fine a point on it, but it seems like, and I could have this wrong, in which case I would ask you to please correct me. I'm sure you know the record better than I do. But the parole officer is saying, you know, where is your room? He points her to the pink bedroom. I think at that point she sees the grandmother's room, comes back. Apparently she's not satisfied with this. Where's your stuff? I don't have any. And then she turns to, you know, the hallway, and then I guess what I understood, and I said this before, is that at the threshold of that bedroom door, she enters there in the face of his nonresponsiveness, enters the threshold of the door and sees the butt of the gun. And I guess, you know, to me that's the point at which we're asking, was this reasonable for her to do a parole check on someone who, I think the cases are pretty clear. You know, I'm also looking at People v. Rodney Johnson from 2020, the First Division. There's a broad societal interest in keeping track of parolees, and they do have a diminished expectation of privacy. Right. I know my time's up, but if I could just briefly address Johnson. In that case, again, like in Wilson, the parole agents verified that the room that they eventually searched was controlled by the defendant before they just barged in and started searching around the whole house. But in that case, do you think the father was there? I believe it was the uncle or maybe it was the father. Yeah. And upon questioning, you know, where's his room, because in that case, too, the defendant, the parolee, I think it was more pertinent, was saying, you know, that's not my room, was denying that he controlled that space. The parolee officer there pursued it sort of aggressively to find his things. Right. And I would, again, just distinguish it from this case where the parole agents did not try to – they didn't continue to investigate. They didn't go ask, you know, the uncle, the sister, the cousin, grandma. They didn't ask anyone, hey, whose room is that? Hey, where does he stay? Unlike in Johnson where they did pursue that and say, okay, does he stay in this bedroom? Is this his bedroom? And the uncle said, yes, that's his room, and then they proceeded to search that. So I think that they, again, handled that in a correct way by saying, okay, we're not sure. They asked additional questions, did additional investigation that didn't involve just sort of tramping around the whole house looking for, you know, anything they could find. They narrowed it down to, okay, we know that the parolee controls this room. That's the room we're going to go search, which is not what happened in this case. And so just to sum up, Mr. Ackles would just ask that this court reverse his convictions for any of the reasons raised in the brief. I have no additional questions. Thank you. Thank you both very much. Thank you. I don't have any either. Thank you both, as Justice Jorgensen has indicated. We appreciate the argument this morning. We will take the matter under advisement. We will issue a decision in due course, and we will now stand rescheduled.